AUSA:    Alyse Wu                Telephone:  (313) 226-9589
AO 91 (Rev. 11/11)  Criminal Complaint        Special Agent:    Shanika Sanders        Telephone:  (313) 226-2573

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Michigan

United States of America
  v.

Shavon Jackson

Case: 2:21−mj−30177
Assigned To : Unassigned
Assign. Date : 4/14/2021
CMP: SEALED MATTER (MAW)

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____July 2020 through the present_____ in the county of _____Wayne_____ in the _____Eastern_____ District of _____Michigan_____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 1343 | Wire Fraud |
| 18 U.S.C. 1341 | Mail Fraud |
| 18 U.S.C. 1349 | Conspiracy to Commit Wire and Mail Fraud |

This criminal complaint is based on these facts:

See attached affidavit.

☑ Continued on the attached sheet.

_Shanika R Sanders_
_Complainant's signature_

Special Agent Shanika Sanders
_Printed name and title_

Sworn to before me and signed in my presence
and/or by reliable electronic means.

Date:    April 14, 2021

_Elizabeth A. Stafford_
_Judge's signature_

City and state:  Detroit, MI

Elizabeth A. Stafford, U.S. Magistrate Judge
_Printed name and title_

**<u>Affidavit in Support of an Application for an Arrest Warrant</u>**

I, Shanika Sanders, being first duly sworn, hereby depose and state as follows:

**<u>Introduction and Agent Background</u>**

1.      I am a Special Agent (SA) of the U.S. Department of Labor, Office of

Inspector General (DOL/OIG), and have been so employed since January 2016.

Prior to this assignment, I was employed as an investigator in Industry Operations

for the Bureau of Alcohol, Tobacco, Firearms and Explosives for three years.  I am

currently assigned to the Detroit Field Office of DOL/OIG.  During my years at the

Department of Labor, I have conducted numerous investigations into criminal

violations of both Title 29 and Title 18 of the United States Code. During this time,

I have been either the lead agent or supporting agent on several investigations

involving criminal schemes targeting the State of Michigan's (SOM)

Unemployment Insurance Agency (UIA) through the filing of false or fictitious

unemployment insurance (UI) claims. Based on my direct personal experience with

these cases, I have become familiar with the methods that criminals use to attack

and exploit the UI systems as well as tools and methods criminals often utilize to

facilitate that fraud.

2.      I have graduated from the Criminal Investigator Training Program (CITP)

and the Inspector General Investigator Training Program (IGITP) at the Federal

Law Enforcement Training Center (FLETC).  I attended and participated in joint in-service sessions for DOL-OIG/OI-LRF agents and Federal Bureau of Investigation (FBI) agents, for training on the current criminal laws prohibiting labor racketeering and other criminal violations of Title 18 and Title 29 of the United States Code.  I have also received training in documentary and electronic evidence given by members of the Computer Crime & Intellectual Property Section (CCIPS) of the U.S. Department of Justice (DOJ).  Furthermore, I received training specific to insider threats and internal employee investigations in IGITP as employee integrity investigations commonly worked by IG agents.

3.     As a result of my participation in this investigation, I submit that there is probable cause to believe that **Shavon Jackson** (DOB XX/XX/1987) has committed federal crimes, including but not necessarily limited to mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), and conspiracy to commit those crimes (18 U.S.C. § 1349).  I make this affidavit based upon personal involvement in the subject criminal investigation, including review of law enforcement databases, financial documents, Internet Service Provider (ISP) records, and unemployment insurance claims data from SOM records detailing a UI fraud scheme perpetrated by **Shavon Jackson** and State of Michigan Lead Claims Examiner Jermaine Rose.  On August 18, 2020, Rose was charged in a criminal complaint in the Eastern District of Michigan for wire fraud (18 U.S.C. § 1343),

mail fraud (18 U.S.C. § 1341), conspiracy to commit those acts (18 U.S.C.

§ 1349), and theft of government funds (18 U.S.C. § 666) (Case No. 20-mj-30303).

4.     I have also been provided with information from other law enforcement

agents and officials from the United States Secret Service (USSS), and the State of

Michigan's Fraud Investigation Unit (SOM-FIU).  Because this affidavit is

submitted for the sole purpose of supporting a criminal complaint and arrest

warrant, it does not necessarily contain all information and facts discovered and

developed in the course of this investigation.

## Summary

5.     In early July 2020, my agency received allegations involving a fraud scheme

aimed at defrauding the SOM and the U.S. Government of millions of dollars

earmarked for Pandemic Unemployment Assistance (PUA).  In reviewing these

allegations, investigating agents identified SOM UIA Lead Claims Examiner

Jermaine Rose as a target of the investigation.  The investigation has shown that

Jermaine Rose has used his position as a SOM employee to wrongfully release

payment on multiple fraudulent UI claims filed against the SOM, including

multiple claims filed by **Shavon Jackson**.  Jermaine Rose was not assigned nor

had any legitimate reason to access, let alone modify, the claims.  The actions of

Rose and others involved in this investigation have resulted in an actual loss of

approximately over $923,000 to the State of Michigan.  Between July 3, 2020 and

July 30, 2020, when he was suspended by the agency, Jermaine Rose attempted to

override holds on approximately over $1,515,000 in additional fraudulent claims.[1]

These attempts were blocked due to daily monitoring by SOM.

### Unemployment Insurance – Background & COVID-19

6.      The Social Security Act of 1935 initiated the federal and state

unemployment insurance system.  The system provides benefits to individuals who

are unemployed for reasons beyond their control.  The purpose of the UI system is

twofold:  first, to lessen the effects of unemployment through cash payments made

directly to laid-off workers, and second, to ensure that life necessities are met on a

weekly basis while the worker seeks employment.  In the State of Michigan, the UI

system is administered by the Unemployment Insurance Agency, which is part of

the SOM's Department of Labor and Economic Opportunity (DLEO).  The U.S.

Department of Labor funds many UIA administrative costs, including salaries,

office expenses, and computer equipment.

---

[1] The criminal complaint charging Rose stated that Rose's actions have resulted in
an actual loss of $1,011,000 and that he was found to have attempted to override
holds on approximately $761,000 in additional fraudulent claims.  Since that time,
SOM conducted further analysis of the claims reviewed by Rose, and provided
Affiant with updated loss calculations.

7.     State unemployment systems and benefits are joint state and federal enterprises largely financed by taxes on private employers located in that state. When state unemployment benefits are exhausted, they may be supplemented by federal funds appropriated by the U.S. Department of Labor. At the time of this application, the federal government is providing significant supplemental benefits to the states as a result of the COVID-19 pandemic.

8.     The Families First Coronavirus Response Act (FFCRA) became law on March 18, 2020, and provided additional flexibility for state unemployment insurance agencies and additional administrative funding to respond to the COVID-19 pandemic. The Coronavirus Aid, Relief, and Economic Security (CARES) Act was later signed into law on March 27, 2020, and the American Rescue Plan Act of 2021 (ARPA) was later signed and further expanded states' ability to provide unemployment insurance for many workers impacted by the COVID-19 pandemic, including for workers who are not ordinarily eligible for unemployment benefits.

The CARES act further expanded states' ability to provide unemployment insurance for many workers impacted by the COVID-19 pandemic, including for workers who are not ordinarily eligible for unemployment benefits.  One such program established to accomplish that end was the Federal Pandemic Unemployment Compensation (FPUC) program.

The FPUC allowed eligible individuals who were collecting certain UI benefits, including regular unemployment compensation, to receive an additional $600 in federal benefits per week for weeks of unemployment ending on or before July 31, 2020.

Another such program, the Pandemic Emergency Unemployment Compensation (PEUC) program, allowed those who exhausted benefits under regular unemployment compensation or other programs to receive up to 13 weeks of additional federally funded benefits up to December 26, 2020.

On December 27, 2020, the President signed legislation that extended these programs for an additional 12 weeks.  Those receiving unemployment benefits were entitled to an additional $300 each week of unemployment until April 4, 2021. At the time of this application, the legislation and programs detailed above have extended many of these federally backed benefits until early September 2021.

That is all to say, the recent federal legislation and programs detailed above allowed for a significant outlay of federal funds to flow to and through the states to offset the recent and historic need of the American workforce for unemployment benefits as a result of the COVID-19 pandemic, including the American workforce in the SOM and in the Eastern District of Michigan (EDMI). Collectively and

colloquially, the funds flowing from these programs have come to be known as
Pandemic Unemployment Assistance (PUA).

9.      Normally (in the absence of fraud), an unemployed worker initiates an UI
claim.  This can be accomplished by submitting a claim in person, over the
telephone, or on the Internet.  Currently, the overwhelming majority of UI claims
are filed online through the UIA's website.  In order to be eligible for UI benefits,
the worker must demonstrate a certain level of earnings in several quarters
immediately preceding the application.  The amount of unemployment benefits that
a UI claimant might be eligible for depends on a variety of factors, including but
not limited to the length of his or her previous employment and the amount of
wages he or she earned.

10.     The SOM UIA will either approve or reject a UI claim based on the
application made by the unemployed worker.  If the SOM UIA approves a UI
claim, the claimant is required to re-certify the claim via telephone or Internet at
various times during the life of the claim.  The worker must also certify that he or
she is still unemployed and actively seeking work.  One way in which
unemployment benefits are provided to a claimant is through the use of a debit
card, issued by the Bank of America (BOA), which is mailed to the claimant
through the U.S. Postal Service. The unemployment benefits are loaded onto the

debit card electronically, and additional benefits are loaded onto the card electronically every two weeks.

## Unemployment Insurance – Fraud Prevention

11.    In an effort to prevent and otherwise inhibit external fraud, SOM UIA captures certain external data surrounding the interaction between an individual and the UIA system.  This data is compiled in a system named the "Michigan Integrated Data Automated System" (MiDAS).  Each time a claim is accessed in MiDAS, it creates a digital footprint of sorts.  Some of the data that the SOM collects includes the dates, times, Internet Protocol (IP) address, and Media Access Control (MAC) address associated with the device accessing the claim. SOM ties this information to the user-entered information captured to facilitate the claim (i.e., name, address, social security number, BOA or other bank account numbers, bank routing numbers, etc.).  SOM's MiDAS system also utilizes certain proprietary algorithms that automatically identify and stop possible fraud based on whether or not a claim exhibits fraud indicators that exceed a designated threshold. Agents also note that humans who review claims and conclude that the payments may be involved in fraud can also take action to stop payment of the claims.

For the remainder of this affidavit, the investigating agent will refer to the process detailed above as a "fraud-stop."

12.     In an effort to prevent and otherwise inhibit internal fraud or insider threats,

SOM UIA captures certain internal data surrounding the interaction between SOM

employees, contractors, consultants and MiDAS.  That is to say that MiDAS

maintains an "audit trail," which details any insider who touches, alters, or

otherwise modifies a claim. SOM can attribute an insider's actions to a particular

individual, as those accessing the system are required to enter unique credentials.

SOM also maintains workflow logs for its employees that detail which claims are

assigned to a particular employee.  Additionally, SOM maintains call logs to

document telephonic contact between employees and claimants.  The workflow

logs and call logs detail whether insiders had a legitimate reason to access or

modify a claim.

13.     Investigators from SOM's Fraud Investigations Unit have the ability to

access and review the data maintained for both external and internal actors in

MiDAS.  It is through the analysis of this data that investigating agents can identify

fraudulent trends and tendencies associated with the unemployment insurance

claims.

## Claims Examiner Jermaine Rose

14.     The investigation has shown that Jermaine Rose was hired by the State of

Michigan on or about March 28, 2004 as an Unemployment Insurance Examiner.

15.     According to the Michigan Civil Service Commission Job Specification

listed on the State of Michigan's website, an Unemployment Insurance Examiner

(UIE) is responsible for reviewing and processing various UI claims using SOM

equipment and the SOM's MiDAS system. UIEs provide services to claimants,

employers, and the general public.

## Probable Cause

16.     In early July 2020, SOM-FIU alerted DOL-OIG about a suspected Pandemic

Unemployment Assistance (PUA) fraud scheme occurring involving a State of

Michigan employee who was then working from home at a residence located in the

Eastern District of Michigan.

17.     SOM-FIU had determined that approximately 27 UI claims were filed

electronically from the same IP address 76.18.228.100. After review of the claims,

it was determined the claims also used the same cell phone number and email

address, even though the claimants seemed to have different names and addresses.

It is common sense that over 25 different individuals with the same phone number

and email address, and all utilizing the same IP address to file their UI claims, is

fraudulent on its face because it is unlikely that so many individuals reside at a

single address and share a phone number and email address (let alone are all

eligible to file UI claims).  Upon further review, a second IP address was tied to

this scheme as well, 68.41.116.95, for an additional 22 UI claims.  16 of these

claims used the same phone number, and 7 used the same email address.  Again, it

is common sense that so many different individuals utilizing the same IP address to

file their UI claims is fraudulent on its face because it is unlikely that so many

individuals reside at a single address (let alone are all eligible to file UI claims); in

addition, the fact that many of the claims used the same phone number or email

address provides further indication of fraud.  40 of the claims filed by the two IP

address were stopped and Identity Verification (IDV) was requested.  Jermaine

Rose improperly accessed, discarded Identity Verification issues, and released

payments on 32 of the 40 fraud-stop claims; this resulted in a loss of over $141,000

to SOM.

18.    The SOM-FIU investigators reviewing Jermaine Rose's audit logs

recognized the aforementioned activity as problematic and subsequently began a

more extensive review of his MiDAS audit logs.  SOM-FIU made the

determination that Rose's actions were fraudulent based on the fact that in the

overwhelming majority, if not every case, Rose overrode a fraud-stop placed on

the underlying claim.  Review by SOM-FIU indicates that Rose neglected to notate

the files as to why the stops were discarded, which is standard procedure for a UIE.

Additionally, SOM-FIU's review of Rose's assigned work items failed to disclose

any legitimate reason to access and/or modify the subject claims.

Finally, through the analysis of Rose's audit logs, SOM-FIU determined that Rose targeted specific claims generally associated with similar IP addresses and physical addresses. That is to say, Rose appeared to be intentionally overriding specific fraud-stops and his actions were not a result of randomly approving unrelated claims.

19.     Agents determined that IP Address 76.18.228.100 was controlled by Comcast and obtained the related records on July 17, 2020. Analysis of the records disclosed that the account was active and the service and billing address associated with the account was XXX5 N Main St, Apt X, Jacksonville, FL 32206. Jacksonville Electrical Authority utility records received on July 17, 2020 stated that the utilities, including the internet, were in the name of the property owner.

20.     On November 30, 2020, records were received from Federal Express (FedEx). Some of the UI cards in this case were used to pay for multiple FedEx deliveries. The records detailed multiple transfers to an individual in Oregon, from **Shavon Jackson**, utilizing the Jacksonville address. The records did not include the contents of the deliveries, however, there are multiple Oregon and Washington State IDs used in the filing of the fraudulent claims in this investigation. The records also detail multiple transfers between **Shavon Jackson** and the individual in Oregon, utilizing a Dearborn Heights address as well.

21.     Agents determined that IP Address 68.41.116.95 was controlled by Comcast and obtained the related records on July 17, 2020.   Analysis of the records disclosed that the account was active and the service and billing address associated with the account was XXX5 Syracuse St., Dearborn Heights, MI 48125.  The Comcast records stated that an individual identified herein as "B.J." was the account holder at the same address were the IP address was located.  The account email user id was sXXXXXjXXXXXXXXX1 and the telephone number for the account was 313-XXX-0147.

22.     On July 28, 2020, records were received from Verizon for the cell phone number 313-XXX-0147.  The cell phone number has been used for multiple UI claims in this investigation.  It was also used in the account information for the Dearborn Heights IP address.  The subscriber to that cell phone number was **Shavon Jackson**, at the Dearborn Heights address—the same address where the 68.41.116.95 IP address is located.

23.     On August 25, 2020, records were received from Yahoo-Oath Holdings for the email address sXXXXXjXXXXXXXXX1@yahoo.com.  This email was used for multiple UI claims filed in this investigation.  The user id was also assigned to the Dearborn Heights IP address with Comcast.  The subscriber to that email address was **Shavon Jackson**.  Multiple times throughout June and August 2020, the

Jacksonville IP address accessed the Yahoo email account.  Also, the cell phone

number 313-XXX-0147 was attached to the Yahoo email address account as well.

## Shavon Jackson's PUA Claims

24.     On June 24, 2020, a PUA claim for an individual identified herein as "A.A."

was electronically filed with the SOM.  A picture of a Louisiana identification and

Social Security card in the name of A.A. was uploaded as proof of identification

for the fraudulent claim on June 25, 2020.  Due to the out-of-state Social Security

Number, the system requested an Identity Verification (IDV).  On June 25, 2020,

Jermaine Rose accessed the account and discarded the IDV, even though the claim

was filed for someone who did not reside in the state of Michigan and also did not

earn wages in the state of Michigan.  The fraudulent PUA claim was processed for

payment, causing a loss of $10,960 to the state of Michigan.

25.     On June 30, 2020, a PUA claim for an individual identified herein as "R.S."

was electronically filed with the SOM.  A picture of a Louisiana identification and

Social Security card in the name of R.S. was uploaded as proof of identification for

the fraudulent claim on June 27, 2020.  Due to the out-of-state Social Security

Number, the system requested an Identity Verification (IDV).  On July 2, 2020,

Jermaine Rose accessed the account and discarded the IDV, even though the claim

was filed for someone who did not reside in the state of Michigan and also did not

earn wages in the state of Michigan.  The fraudulent PUA claim was processed for payment, causing a loss of $10,200 to the state of Michigan.

26.     On June 30, 2020, a PUA claim for an individual identified herein as "J.T." was electronically filed with the SOM.  A picture of a Louisiana identification and Social Security Number card was uploaded as proof of identification for the fraudulent claim on June 27, 2020.  Due to the out-of-state Social Security Number, the system requested an Identity Verification (IDV).  On July 2, 2020, less than 15 minutes after accessing the R.S. UI claim, Jermaine Rose accessed the account and discarded the IDV, even though the claim was filed for someone who did not reside in the state of Michigan and also did not earn wages in the state of Michigan.  The fraudulent PUA claim was processed for payment, causing a loss of $10,200 to the state of Michigan.

27.     On June 30, 2020, a PUA claim for an individual identified herein as "D.M." was electronically filed with the SOM.  A picture of a Washington state identification and Social Security card was uploaded as proof of identification for the fraudulent claim on June 30, 2020.  Due to the out-of-state Social Security Number, the system requested an Identity Verification (IDV).  On July 2, 2020, less than 15 minutes before accessing the R.S. UI claim, Jermaine Rose accessed the account and discarded the IDV, even though the claim was filed for someone who did not reside in the state of Michigan and also did not earn wages in the state

of Michigan.  The fraudulent PUA claim was processed for payment, causing a loss of $10,200 to the state of Michigan.

28.     All four of the claims described above included Jackson's email address and phone number.  They were also filed from the same IP address, and used a similar mailing addresses in Jacksonville, FL (even though the identifications uploaded with the claims were from Louisiana and Washington). On July 2, 2020, in less than 40 minutes, Jermaine Rose accessed three of those four fraudulent claims associated with **Shavon Jackson**.  And in total on that day, Jermaine Rose accessed 10 of the fraudulent claims filed by that IP address.

29.     **Shavon Jackson** uploaded her real Michigan identification card when applying for her own UI benefits.  The ID below was compared to the automated teller machine (ATM) photos provided by Bank of America, to confirm the identity of who was using the fraudulently obtained UI debit cards.



30.     On July 1, 2020, **<u>Shavon Jackson</u>** can be seen making a withdrawal with a Bank of America UI debit card that was obtained in connection with the aforementioned fraudulent UI claims. For example, below is a withdrawal with the A.A. card.



30.    On July 7, 2020, **Shavon Jackson** can be seen, along with another individual, making a withdrawal with Bank of America UI debit cards that were obtained in connection with the aforementioned fraudulent UI claims. For example, below is a withdrawal with the R.S. card.



31.    Secondly, **Shavon Jackson** can be seen, along with the same individual,

making a withdrawal with the J.T. card.



The images contained in this transmission were generated for the internal use of Bank of America and are being shared with law enforcement solely for use by law enforcement.  Written consent must be obtained from Bank of America prior to sharing an image with a third party.  Bank of America makes no representation or warranty of any kind with respect to any photograph, film, videotape or digital image and specifically disclaims liability to any person or entity for all damages, losses, claims, or expenses (including attorney's fees) arising from the furnishing or subsequent use, distribution or publication of any photograph, film, videotape or digital image provided to law enforcement by Bank of America.  Any use or further distribution of this photograph, film, videotape or digital image by any party not employed directly by Bank of America is the sole responsibility of the user/distributor. Bank of America will only certify or attest to records or images provided under valid legal process.

32.   Finally, **<u>Shavon Jackson</u>** can be seen, along with the same individual, making a withdrawal with the D.M. card.



All three of the withdrawals were conducted at the same Bank of America ATM in Jacksonville, Florida, and were conducted one right after the other.

33.   On November 10, 2020, Bank of America provided bank records for 19 Michigan Unemployment Insurance debit cards that were associated with claims that appear to have been fraudulently filed by Jackson, including statements and ATM photos. The cards were used primarily to make ATM withdrawals from Bank of America ATMs.  Due to video retention limits by Bank of America, photos were

only provided for six of those debit cards. **Shavon Jackson** was seen at the ATM

with all six of those cards.  None of the cards used were issued to her.

34.     In my training and experience, it appears that **Shavon Jackson** fraudulently

filed UI claims in order to obtain unemployment benefits she was not entitled to.

The IP addresses associated with residences connected to **Shavon Jackson** were

responsible for electronically filing the above-described PUA claims.  Many of the

claims used out-of-state forms of identification by individuals who have never

resided in Michigan or have never earned wages in Michigan, making them

ineligible for federal PUA benefits in the state of Michigan.  Also, many of the

claims used **Shavon Jackson's** cell phone number and email address as contact

information.  With the filing of these fraudulent claims, **Shavon Jackson**

attempted to defraud the State of Michigan out of approximately over $784,000,

but actually obtained approximately $141,720.

### Uses of Mail and Wires

35.     After the Unemployment Insurance Agency accepts an unemployment

claim, it transfers the initial unemployment benefits into an account associated

with a bank, a prepaid debit card, or with an unemployment insurance debit card.

UI funds are sent via wire from Michigan and processed through the Bank of

America (which handles all Michigan UI processing), specifically through Bank of

America data center locations in the states of Virginia and Texas. In this case, after the funds were processed through Bank of America, **Shavon Jackson** used the Bank of America debit cards to make cash withdrawals from ATMs throughout the Jacksonville, Florida Metro area. Therefore, the disbursement of these fraudulently obtained UI funds involved the use of interstate wires, which constitutes a violation of 18 U.S.C. § 1343 (and conspiracy to commit that offense in violation of 18 U.S.C. § 1349).

36.    In this investigation, unemployment insurance debit cards provided by Bank of America were mailed to addresses in both Michigan and Florida utilizing the United States mail at the addresses provided for the fraudulent UI claims. These debit cards could be used to access the fraudulently obtained UI funds via ATMs or could be used at accepting retailers for point of purchase transactions. Therefore, the mailing of these debit cards involved the use of the United States mail which constitutes a violation of 18 U.S.C. § 1341 (and conspiracy to commit that offense in violation of 18 U.S.C. § 1349).

**Summary**

37.    Based on my training and experience, the activity detailed above appears to be part of an UI fraud scheme perpetrated by **Shavon Jackson** and Jermaine Rose,

and may involve other co-conspirators known and unknown to law enforcement. The basis for my statement derives from the information below:

a.      During my career at DOL, I have worked several UI fraud cases involving multiple fraudsters and I am familiar with how criminals can manipulate the SOM's UI system to obtain fraudulent benefits.

b.      Within the last 30 days, I have had conversations with members of the law enforcement intelligence community concerning the rampant levels of PUA fraud occurring all over the country.  Those officials have discussed with me various scams and schemes they are tracking involving PUA including the possibility of insiders facilitating UI fraud schemes, including schemes similar to this.

Additionally, the FBI has advised that there are significant criminal resources and "guides" available through criminal networks on how to defraud various states, including SOM, of PUA benefits.  Many of these schemes involve coordinated efforts by a group of individuals who are communicating using electronic devices and social media.

c.      Based on Jermaine Rose's activity, it appears that the general scheme proceeds as follows.  Outside co-conspirators enter bad claims into MiDAS and provide the names/social security numbers associated with the claims to Jermaine

Rose.  Jermaine Rose then discards any fraud-stops on the bad claims, facilitating the release of the fraudulently obtained payments.  Review of Jermaine Rose's cell phone seized during a search warrant shows he has used Facebook Messenger, calls, and text messages to communicate during these fraud schemes with some of his co-conspirators.  This is bolstered by SOM-FIU analysis that Jermaine Rose's activity does not appear random, but rather targeted at specific claims.

## **Conclusion**

38.     Based on the forgoing, there is probable cause to believe that **Shavon**

**Jackson** has committed federal crimes, including but not necessarily limited to

mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), and conspiracy to

commit those acts (18 U.S.C. §, 1349), in connection with a scheme to defraud the

federal/state unemployment insurance program and obtain unemployment benefits

by means of false and fraudulent pretenses and representations.

Respectfully submitted,

*Shanika R Sanders*

Shanika Sanders
Special Agent
U.S. Department of Labor –
Office of Inspector General

Sworn to before me and signed in my
presence and/or by reliable electronic means.

*Elizabeth A. Stafford*

ELIZABETH A. STAFFORD
UNITED STATES MAGISTRATE JUDGE